UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:

NETBANK, INC.,                                   Case No. 3:07-bk-04295-JAF

      Debtor.

_____/

LAUREN MAXWELL,

      Plaintiff,                           Adv. Pro. No. 3:08-ap-00059

v.

NETBANK, INC.,

      Defendant.

_____/

## ORDER GRANTING MOTION TO DISMISS AMENDED ADVERSARY COMPLAINT

This proceeding came before the Court upon Motion to Dismiss Adversary Complaint and Supporting Memorandum of Law filed by Defendant, NetBank, Inc., the debtor and debtor-in-possession in the above-captioned Chapter 11 case ("NetBank"), through the undersigned counsel for the Official Committee of Unsecured Creditors (the "Committee"), as intervenor on behalf of Defendant, NetBank, Inc., (the "Motion to Dismiss"), Response of Plaintiff Lauren Maxwell ("Maxwell") in Opposition to Defendant Netbank Inc.'s Motion to Dismiss Amended Complaint (the "Response") and Reply to [the Response] (the "Reply"). The following facts are undisputed.

## BACKGROUND

1. Maxwell is a former vice president of NetBank's subsidiary, Market Street Mortgage Corporation ("Market Street"). (Doc. 25, ¶ 6).

2. On November 5, 2002, NetBank established a non-qualified deferred compensation program ("NQDCP") for the benefit of its eligible employees, including Maxwell. Maxwell attached to her Amended Complaint copies of the "Nonqualified Deferred Compensation Program Including § 401(k) Transfer Adoption Agreement," the "Summary Plan Description," and the "Basic Program Document," which detail the terms of the NQDCP. These materials are attached to the Amended Complaint as Exhibits A, B, and C, respectively. (Doc. 25, ¶¶ 9-11; Exhs. A, B, & C). The Summary Plan Description defines eligible employees as senior officers, senior vice president and above, and associates whose annual income is $90,000 or higher. Maxwell was eligible to participate and agreed to participate in the NQDCP.

3. Pursuant to the terms of the NQDCP, participants were entitled to voluntarily contribute funds to the NQDCP, which entitled them to defer a certain percentage of their pre-tax compensation until subsequent years. (Doc. 25, Exh. A, p.7 & Exh. B, p. 4).

4. The Summary and the Basic Program Document both provide that distributions from the NQDCP would be made to the employee within thirty days of an employee's termination of employment. (Exh. A p. 8, Exh. B. ¶ 6.2(a)).

5. On January 1, 2004 Maxwell began contributing a portion of her employment compensation to her personal account within the NQDCP (the "Account").

(Doc. 25, ¶ 16). Maxwell's contributions from her compensation as an employee of NetBank were the sole source of funds in the Account. (Doc. 25, ¶ 16).

6. On or before June 18, 2007 Maxwell requested a lump sum distribution of all of the funds held in the Account from Netbank. (Doc. 25, ¶ 19).

7. As of June 30, 2007 the Account balance was $630,825.26. (Doc. 25, Ex. D.)

8. On or about July 19, 2007, Maxwell's employment with Market Street was terminated. (Doc. 25, ¶ 22). On that same day Maxwell again demanded a lump sum distribution of all of the funds held in the Account. (Doc. 25, ¶ 23 & Exh. E).

9. On July 31, 2007, $208,362.76 was distributed to Maxwell pursuant to the NQDCP. (Doc. 25, ¶ 24).

10. On August 28, 2007 Netbank refused to distribute any money Maxwell contributed to the Account from January 1, 2005 until six months after Maxwell's separation from Netbank because Maxwell was a "key employee". (Doc. 25, ¶ 25, Ex. F.) This was the first notice to Maxwell of Netbank's refusal to turn over the funds held in the Account to Maxwell. (Doc. 25, ¶ 25).

11. On September 28, 2007 Netbank filed a Chapter 11 bankruptcy petition.

12. In October 2007, Netbank liquidated the Account and transferred the proceeds of the Account to its general operating account at Wachovia Bank. (Doc. 25, ¶ 26).

Maxwell filed this Amended Complaint, which is framed in three counts, each of which seeks the imposition of a constructive trust: Count I purports to be a claim pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §

1132(a)(1)(B), to recover benefits under the NQDCP. Count II purports to be a claim for unjust enrichment seeking equitable relief under 29 U.S.C. § 1132(a)(3) of ERISA. Count III incorporates all of the pertinent allegations of the previous two counts and seeks a constructive trust over NetBank's general operating account.

Netbank seeks to have the Amended Complaint dismissed on the basis that it fails to state a claim upon which relief can be granted. Netbank asserts that the documents attached to the Amended Complaint conclusively show that Maxwell is at best a general unsecured creditor of NetBank with no claim whatsoever to specific identifiable funds. Netbank contends that Maxwell is improperly attempting to elevate herself from a general unsecured creditor to a secured creditor through the imposition of a constructive trust over NetBank's general operating account. Finally, Netbank asserts that the Amended Complaint must be dismissed for failing to join a necessary party, i.e., Merrill Lynch.

## **MOTION TO DISMISS STANDARD**

For a motion to dismiss, allegations in the complaint are accepted as true and construed favorably for the plaintiff. Fin. Sec. Assur., Inc. v. Stephens, Inc., 500 F.3d 1276, 1282 (11th Cir. 2007). The allegations "must 'possess enough heft' to set forth 'a plausible entitlement to relief.'" Id. (quoting Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1966-67 (2007)). The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is low. However, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 127 S. Ct. at 1959.

Of particular significance to this case is the well-established principle that

> [c]onclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted by facts disclosed by a document appended to the complaint. If the appended document, to be treated as part of the complaint for all purposes under Rule 10(c), Fed. R. Civ. P., reveals facts which foreclose recovery as a matter of law, dismissal is appropriate.

Griffin Indus. Inc. v. Irvin, 496 F.3d 1189, 1205-06 (11th Cir. 2007) (quoting Associated Builders, Inc. v. Ala. Power Co., 505 F.2d 97, 100 (5th Cir. 1974)). Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, which is made applicable to adversary proceedings by Rule 7010 of the Bankruptcy Rules, documents attached to a pleading "are considered part of the pleadings for all purposes, including a Rule 12(b)(6) motion." Solis-Ramirez v. U.S. Dep't of Justice, 758 F.2d 1426, 1430 (11th Cir. 1985). "Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control." Simmons v. Peavy-Welsh Lumber Co., 113 F.2d 812, 813 (5th Cir. 1940).

**Application to the Instant Case**

The NQDCP utilizes what is commonly referred to as a "grantor" or "rabbi" trust to accumulate and invest funds to be distributed as benefits under the plan.[1] The Internal Revenue Service allows and regulates the use of grantor or rabbi trusts as a way of deferring the payment of taxes to deferred compensation plan participants. See Rev. Proc. 92-64. The favorable tax treatment of such trusts is conditioned on the fact that

---

[1] See Exhibit A, Section 1(c): "The Trust is intended to be a grantor trust, of which the Company is the grantor, within the meaning of subpart E, part I, subchapter J, Chapter 1, subtitle A of the Internal Revenue Code of 1986, as amended, and shall be construed accordingly."

plan participants have no interest or claim to any trust funds, including their own "contributions" and that the trust funds are subject to the claims of the company's general creditors. Participants avoid the "constructive receipt of income" and "economic benefit" doctrines that ordinarily trigger the recognition of income because they accept the risk that they may never receive them if the company becomes insolvent. Plan participants "are never assured of a payment because the assets remain subject to the claims of the employer's creditors." Goodman v. Resolution Trust Corp., 7 F.3d 1123, 1127 (4th Cir. 1993); see also Accardi v. IT Litig. Trust (In re IT Group, Inc.), 448 F.3d 661, 665 (3d Cir. 2006) ("The employee is not subject to tax on the compensation until he or she actually receives the deferred amount because 'the employee may never receive the money if the company becomes insolvent.'") (quoting David J. Cartano, *Taxation of Compensation & Benefits* § 20.01, at 709 (2004)); McAllister v. Resolution Trust Corp., 201 F.3d 570, 575 (5th Cir. 2000); Resolution Trust Corp. v. MacKenzie, 60 F.3d 972, 974, 976-77 (2d Cir. 1995); Silicon Graphics, Inc. v. Merrill Lynch Trust Co. (In re Silicon Graphics, Inc., 363 B.R. 690, 693, 699 (Bankr. S.D.N.Y. 2007); In re Worldcom, Inc., 364 B.R. 538, 543 (Bankr. S.D.N.Y. 2007).[2] "'In reality, the recipient receives only the company's unsecured promise to pay benefits and has no right against any assets other than the rights of a general unsecured creditor of the company, . . . The employer will be treated as the owner of the trust.'" Cortina v. Sovran Bank, N.A., 927 F. Supp. 439, 442 (S.D. Fla. 1994)(quoting *Mertens Law of Federal Income Taxation*, § 25B.212 (1988)).

---

[2] The NQDCP is a "top hat" plan subject to ERISA's administrative and enforcement provisions, but exempt from ERISA's substantive provisions. In re IT Group, Inc., 448 F.3d at 664.

## Pertinent Terms of the NQDCP Documents

The Court finds that the documents attached to the Amended Complaint establish that Maxwell has no interest or claim to any of the Trust funds transferred to NetBank's general operating account and that she is not entitled to a constructive trust. The Basic Program Document, which is attached to the Amended Complaint as Exhibit C, states as follows in the Preamble: "Participants shall have the status of general unsecured creditors of the employer and the Program constitutes an unsecured promise by the employer to make benefit payments in the future." (Doc. 25, Exh. C, p. 1). Further, paragraph 1.23 of Article I of the Basic Program Document reads, in part:

> Any assets held under the terms of the Trust shall be the exclusive property of the Company and shall be subject to creditor claims of the Company. Participants shall have no right secured or unsecured to any assets held under the terms of the Trust.

(Id. at ¶ 1.23, p. 4). Paragraph 4.1 of Article IV of the Basic Program Document further provides that any employee deferrals and company contributions remitted by NetBank to Merrill Lynch remain the property of NetBank and are subject to the claims of NetBank's creditors: "Any such Deferrals held and managed by the Trustee plus any investment earnings thereon shall remain the property of the Company and shall be subject to the claims of the Company's creditors." (Id. at ¶ 4.1, p. 9).

To the extent Maxwell alleges NetBank promised to hold funds contributed to the NQDCP in separate accounts for the benefit of each participant (Doc. 25, ¶¶ 14, 16, & 18), such allegations are contradicted by paragraph 5.1 of the Basic Program Document. Paragraph 5.1 makes plain that such accounts were "bookkeeping accounts" kept for the

purpose of determining the value of a participant's benefits. (Exh. C, ¶ 5.1, p.10). Paragraph 5.1 states: "The Administrator shall establish and maintain individual bookkeeping accounts on behalf of each Participant for purposes of determining each Participant's benefits under the Program." Netbank was not required to use the Trust assets to pay any of the benefits due under the NQDCP. Paragraph 9.1 states in pertinent part: "Coincident with the establishment of the Program, the Company shall establish a Trust for the purpose of accumulating assets which may, but need not be used, by the Company to satisfy some or all of its financial obligations to provide benefits to Participants under this Program." (Id. at ¶ 9.1, p. 18).

With respect to the effect of vesting of benefits under the NQDCP, paragraph 6.1 of the Basic Program Document states: "In no event will a Participant's right to a benefit under this Program give such Participant a secured right or claim on any assets held in the Trust." (Id. at ¶ 6.1, p. 12). Regarding the vesting of benefits, the Basic Program Document explains that the benefits attributable to deferred compensation are nonforfeitable, but that they would not be payable until a distributable event occurs under the program. (Id. at ¶ 7.1, p. 15).

Importantly, even after the benefits become vested and payable, the participant has no interest or claim to any assets held in the trust. Specifically, paragraph 7.3 of the Basic Program Document reads:

> Regardless of a Participant's vested status, no Participant shall have any vested interest in or claim to any assets held under the Trust *either before or after* the Participant attains his or her Benefit Distribution Date. A Participant's vested interest in benefits payable under the Program, *not the Trust*, shall be determined in accordance with paragraph 7.1 [Deferrals] and 7.2 [Company Contributions] and the

> election made by the Company in the Adoption Agreement. A Participant's option to state an investment preference under paragraph 9.3 hereof shall not give a Participant or Beneficiary any ownership right or interest in any asset held in the Trust. Any rights a Participant has with respect to benefits shall be determined by the Program.

(Id. at ¶ 7.3, p. 15 (emphasis added)).

Lastly, the Basic Program Document explains the relationship with the Trust and what happens to the trust assets in the event of bankruptcy:

> Coincident with the establishment of the Program, the Company shall establish a Trust for the purpose of accumulating assets which may, but need not be used, by the Company to satisfy some or all of its financial obligations to provide benefits to Participants under this Program. All assets held in the Trust shall remain the exclusive property of the Company and shall be available to pay creditor claims of the Company in the event of bankruptcy. The assets held in Trust shall be administered in accordance with the terms of the separate trust agreement between the Trustee and the Company.

(Id. at ¶ 9.1, p. 18).[3]

Maxwell also attached to her Complaint a "Summary Plan Description," which she admits she received prior to her termination of employment. (Doc. 25, ¶ 10 & Exh. B). This document is entirely consistent with the Basic Program Document and states, in bold:

---

[3] The Trust also provides that the trustee shall cease payment of benefits in the event that NetBank is insolvent. (Exh. A, Section 3(a)). Section 3(b)(3) of the Trust Agreement provides:

> If at any time the Trustee has determined that the Company is insolvent, the Trustee shall discontinue payments to Participants or their Beneficiaries and shall hold the assets of the Trust for the benefit of the Company's general creditors. Nothing in this Trust Agreement shall in any way diminish any rights of Participants or their Beneficiaries to pursue their rights as general creditors of the Company with respect to benefits due under the Program or otherwise.

> **Please note that the NQDCP is an unfunded plan. NetBank is making an unsecured promise to pay benefits under the Program. You will be a general creditor of the Employer to the extent of your account balance.**

(Doc. 25, Exh. B, p. 4). The Summary Plan Description also states:

> You and your beneficiary(ies) are an unsecured general creditor of the Company, NetBank, Inc., to the extent of the value of your account balance. You and your beneficiary(ies) have no ownership or other interest in any financial or other instrument, asset or arrangement that NetBank, Inc. may acquire or enter into should the Company elect to hedge its NQDCP obligations.

(Id. at p. 8).

### Constructive Trust

Each count of the Amended Complaint includes a request in the prayer for relief that a constructive trust be established in favor of Maxwell. It is plain from the Complaint and the materials attached to it that NetBank has not wrongfully obtained possession of Maxwell's property. The NQDCP documents state that the assets held in the Trust, including any amounts deferred by participants, are the property of NetBank. As set forth in the materials attached to her Amended Complaint, Maxwell has no claim to or interest in the funds that were held in trust. (Doc. 25, Exh. C, ¶¶ 1.23, 4.1, 6.1, 7.3, & 9.3). Maxwell is a general unsecured creditor. This is true, even though her benefits under the NQDCP had vested, and even assuming benefits were immediately payable (which they were not). Indisputably, the assets in the Trust were exclusively the property of NetBank and were at all times subject to the claims of general unsecured creditors. (Doc. 25, Exh. C, ¶¶ 1.23, 4.1, 6.1, 7.3, & 9.3).

The fact that Maxwell requested her benefits prior to the petition date does not change the result. The funds were still in the Trust as of the petition date and were, therefore, the property of NetBank subject to the claims of NetBank's creditors. (Id. at ¶ 4.1). Maxwell's assertions in Counts I and III that she is entitled to a constructive trust because she requested benefits prior to the petition date has already been considered and rejected by the Second Circuit in Resolution Trust Corp. v. MacKenzie, 60 F.3d 972 (2d Cir. 1995), and by the Bankruptcy Court for the Southern District of New York in Silicon Graphics, Inc. v. Merrill Lynch Trust Co. (In re Silicon Graphics, Inc., 363 B.R. 690 (Bankr. S.D.N.Y. 2007). In MacKenzie, the Second Circuit considered whether a receiver had superior rights to grantor trust assets "where a grantee's claim to those assets was made prior to receivership." 60 F.3d at 976. The court concluded that even though the grantees made their claims prior to the receivership, the funds had not been distributed from the grantor trust; therefore, the assets remained property of the employer subject to the claims of its creditors. Id. at 977. The court explained:

> At the time the Claimants made their demand for payment, they were merely general unsecured creditors of Columbia. Rightly or wrongly, the Plan assets remained in the grantor trust held by Norstar, thus Columbia's property, at the time RTC was appointed Receiver for Columbia. This fact is itself dispositive . . . .

Id.

In a closely analogous case, the Bankruptcy Court for the Southern District of New York in In re Silicon Graphics followed MacKenzie in rejecting a claim by the debtor's former CEO seeking to impose a constructive trust over nonqualified deferred compensation plan funds held in a grantor or rabbi trust. In re Silicon Graphics, 262 B.R.

at 698-700. Just like Maxwell, the claimant in Silicon Graphics had made a request for disbursement of the funds before the debtor filed its petition for bankruptcy, but certain funds had not been disbursed by the petition date. Id. at 699. The bankruptcy court, following MacKenzie, dismissed the action for a constructive trust, concluding that the funds in the rabbi trust were the property of the debtor subject to the claims of general creditors, and that this was done so that the plan participants could obtain tax benefits. Id. The bankruptcy court rejected the claimant's attempt to obtain "a superior right to" the plan assets by imposing a constructive trust. Id. at 699-700 (noting "'the constructive trust doctrine can wreak . . . havoc with the priority system ordained by the Bankruptcy Code,' and bankruptcy courts are thus 'generally reluctant to impose constructive trusts without a substantial reason to do so.'") (quoting In re First Cent. Fin. Corp., 377 F.3d 209, 217 (2d Cir. 2004)).

Maxwell cannot state a claim for unjust enrichment. NetBank could not have been unjustly enriched when it received its own assets. Maxwell never had any interest or claim in the assets held in Trust. Instead, she is a general creditor to the extent of the balance of the benefits remaining unpaid.

### Six Month Delay Rule

Maxwell argues that Netbank refused to comply with the terms of the Summary and Basic Program Document, which both required Netbank to turn over the proceeds to Maxwell within thirty days of the termination of her employment. Maxwell argues that in failing to turn over the proceeds to her prior to the petition date, Netbank breached its fiduciary obligation to her and she is therefore entitled to a constructive trust to recover the proceeds.

-12-

Netbank contends that it did not pay Maxwell her deferred compensation benefits within thirty days of her request because it was complying with the rule set out in 26 U.S.C. § 409A and its accompanying regulations (the "Six Month Rule"). Pursuant to the Six Month Rule distributions from a non-qualified deferred compensation account to "key employees" or "specified employees" must be delayed for six months following the employee's termination in order for the distributions to receive beneficial tax treatment. A "key employee" is defined to include an officer of the employer who has an annual salary in excess of $145,000 for 2007. 26 U.S.C. § 416(i)(1)(A)(i) (2007). Maxwell concedes that distributions form a non-qualified deferred compensation account can be delayed under certain circumstances pursuant to the Six Month Rule, but asserts that the Six Month Rule is not applicable to the instant case because NetBank failed to comply with certain pre-requisites to the Six Month Rule.

Maxwell asserts that the Six Month Rule only applies where the employer provides affected employees with written advance notice of the employer's (a) adoption of the Six Month Rule and (b) identification of the employee as a "key employee" or a "specified employee" within the meaning of Section 409A. Maxwell contends that the Six Month Rule does not apply in the instant case because Netbank never amended the terms of the NQDCP to adopt the six month rule, never informed Maxwell that it adopted the Six Month Rule, never informed Maxwell that it identified her as a "key employee" or a "specified employee" and presumably never identified Maxwell as a "key employee".

26 C.F.R. § 1.409-1(c)(3)(v) provides as follows:

> **v) Six-month delay for specified employees.** A plan must provide that distributions to a specified employee may not be made before the date that is six months after the date of separation from service or, if earlier, the date of death (the six-month delay rule). The six-month delay rule, required for payments due to the separation from service of a specified employee, must be written in the plan. A plan does not fail to be established and maintained merely because it does not contain the six-month delay rule when the service provider who has a right to compensation deferred under such plan is not a specified employee. However, such provision must be set forth in writing on or before the date such service provider first becomes a specified employee. In general, this means the provision must be set forth in writing on or before the specified employee effective date (as defined in paragraph (i)(3) of this section) for the first list of specified employees that includes such service provider.

While this provision does not say anything about an employer having to provide notice before it must (or even may) comply with the Six Month Rule, it does require that the Six Month Rule be in writing. However, the Internal Revenue Service extended the deadline for complying with 1.409A-1(c)(3)(v)'s writing requirements until December 31, 2008. I.R.S. Notice 200786, 2007 WL 3054961 at §§ 2 & 3. Thus, at all times relevant to this adversary proceeding, the Internal Revenue Service has not required that plan documents set forth the Six Month Rule in writing.

Although employers had until the end of 2008 to amend the plan documents in writing to include the Six Month Rule, employers were required to operate the plan in compliance with § 409A and the Six Month Rule. During 2007, which is the year that the material events in Maxwell's Amended Complaint took place, I.R.S. Notice 2006-79 was in effect and provided, in relevant part:

> A plan adopted on or before December 31, 2007 will not be
> treated as violating section 409A(a)(2), (3) or (4) on or
> before December 31, 2007 if the plan is operated through
> December 31, 2007 in reasonable, good faith compliance
> with the provisions of section 409A and applicable
> provisions of Notice 2005-1 and any other generally
> applicable guidance published with an effective date prior
> to January 1, 2008, and the plan is amended on or before
> December 31, 2007 to conform to the provisions of section
> 409A and the final regulations with respect to amounts
> subject to section 409A.

Maxwell does not deny that she was a key employee. Maxwell's Amended Complaint does not allege that Netbank wrongly delayed paying her benefits because she was not a key employee. The Court finds that the Six Month Rule applied in the instant case and that Netbank's actions in delaying payment to Maxwell were appropriate.

However, even assuming for purposes of argument that Netbank should not have applied the Six Month Rule and should have distributed Maxwell's benefits to her within thirty days of her termination, Maxwell has at best an ERISA claim for breach of the NQDCP. A constructive trust is not "proper equitable relief" under ERISA, § 1132(a)(3) where the plaintiff merely has a breach of contract action. Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 214 (2002) (holding equitable relief not available under ERISA to impose liability for breach of contract).

### Netbank did not owe Maxwell Fiduciary Duties

Finally, the Court finds that Netbank's failure to disburse Maxwell's benefits to her within thirty days of her termination does not constitute a breach of fiduciary duty because there is no cause of action for a breach of fiduciary duty involving a "top hat" plan, like the NQDCP. A top hat plan is "a plan which is unfunded and is maintained by

an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S. C. §§ 1051(2), 1081(a)(3), 1101(a)(1); see also Holloman v. Mail-Well Corp., 443 F.3d 832, 837 (11th Cir. 2006). There is no dispute that the NQDCP is a top hat plan. The Preamble to the Basic Program Document states, in part, that the Netbank established "an unfunded Nonqualified Deferred Compensation Program for a select group of management or highly compensated Employees." (Doc. 1, Exh. C). Paragraph 1.17 defines the NQDCP as "[a] Program, within the mean ing of ERISA §201(2) [29 U.S.C. § 1051(2) (defining unfunded deferred compensation plans)], the purpose of which is to permit a select group of management or highly compensated Employees to defer receipt of a portion of their Compensation to a future date." (Id. at Exh. C, ¶ 1.17). Paragraph 9.2 sets out that the NQDCP is an unfunded plan: "In no event will the assets accumulated by the Company in the Trust be construed as creating a funded Program under the applicable provisions of ERISA, or under the Code, or under the provisions of any other applicable statute or regulation." (Id. at Exh. C, ¶ 9.2).[4] Benefit plans that use "rabbi trusts," like the Trust managed by Merrill Lynch, are considered unfunded for the purposes of ERISA because the assets remain subject to the claims of the employer's general creditors. In re IT Group, Inc., 448 F.3d 661, 665 (3d Cir. 2006) ("An employer may set aside deferred compensation amounts in a segregated fund or trust without jeopardizing a plan's

---

[4] The Trust Agreement attached to NetBank's Motion to Dismiss (Doc. 29, Exh. A) states: "WHEREAS, it is the intention of the parties that this Trust shall constitute an unfunded arrangement and shall not affect the status of the program as unfunded arrangements maintained for the purpose of providing deferred compensation for a select group of management or highly compensated employees for purposes of Title I of the Employee Retirement Income Security Act of 1974. . . ."

'unfunded' status if the fund or trust remains subject to the clams of the employer's creditors in the event of insolvency or bankruptcy." (quotation omitted)); In re Silicon Graphics, Inc., 363 B.R. 690, 696 (S.D.N.Y. 2007) (describing a similar plan as a "top hat" plan); Northwestern, 848 F. Supp. at 1518-19 ("If an employer creates a so-called 'rabbi' trust to hold assets that finance a benefit plan, the plan remains 'unfunded' for ERISA purposes.").

It is well settled that a breach of fiduciary duty claim will not lie with respect to the administration of a top hat plan. "The fiduciary responsibility provisions of ERISA, 29 U.S.C. §§ 1101-14, do not apply to top hat plans." Holloman, 443 F.3d at 842-43; see also 29 U.S.C. § 1101(a)(1) (excluding top hat plans from ERISA's fiduciary provisions, 29 U.S.C. §§ 1101-14). In Holloman, the Eleventh Circuit affirmed the district court's rejection of a participant's breach of fiduciary duty claims against an employer relating to the employer's administration of two top hat plans. Id. The Eleventh Circuit (citing decisions from the Second, Third, Fifth, and Seventh Circuits)[5] held that the employer did not owe participants of the top hat plans any fiduciary duties. Id. at 842 ("Because the two plans at issue are both top hat plans, Mail-Well owed no fiduciary duties to the

---

[5] The Eleventh Circuit cited: Goldstein v. Johnson & Johnson, 251 F.3d 433, 443 (3d Cir. 2001) ("[W]e reject [defendant's] contention that, because ERISA's definitional section lists 'fiduciary' as one who exercises discretion in interpreting the terms of a plan, administrators of top hat plans are also fiduciaries. To begin with, ERISA explicitly states that top hat plans are not subject to the ERISA's fiduciary requirements. Further, it is well established in the caselaw that there is no cause of action for breach of fiduciary duty involving a top hat plan." (citations omitted)); Reliable Home Health Care, Inc. v. Union Cent. Ins. Co., 295 F.3d 505, 512, 516 (5th Cir. 2002) (finding that the plaintiff could not recover from a plan provider for breach of fiduciary duty because the plan was a top hat plan); Garratt v. Knowles, 245 F.3d 941, 949 (7th Cir. 2001) ("Garratt had suggested that despite preemption of his state law claims, ERISA would permit his suit against the defendants for breach of fiduciary duty. However, since a top hat plan is exempt from ERISA's fiduciary rules, Garratt would have no basis to bring such a claim."); Demery v. Extebank Deferred Comp. Plan (B), 216 F.3d 283, 290 (2d Cir. 2000) ("[A]s the fiduciary responsibility

Hollomans under ERISA. It necessarily follows that the Hollomans have no claim against Mail-Well for breach of fiduciary duties under ERISA."); see also Northwestern, 848 F. Supp. at 1520. Because top hat plans are by definition "unfunded," the employer has not set aside specific funds that must be held and administered for the benefit of participants. The assets in the Trust are NetBank's property, and participants are not Trust beneficiaries. NetBank could not be a fiduciary with respect to the handling of its own assets.

Even assuming NetBank was a plan administrator as Maxwell alleges, it did not owe Maxwell any fiduciary duties because the NQDCP was a top hat plan. 29 U.S.C. § 1101(a)(1). Maxwell cannot obtain a constructive trust on the theory that NetBank breached a fiduciary duty owed to her. Instead, she has no greater rights than under the plan. The NQDCP plainly provides that she has no interest in the Trust assets, that she is a general creditor, and that the Trust assets were the property of NetBank subject to the claims of its general creditors. Upon the foregoing, the Court finds that the Amended Complaint is due to be dismissed. It is

**ORDERED:**

The Amended Complaint is dismissed.

**DATED** this 26 day of March, 2009 in Jacksonville, Florida.

JERRY A. FUNK
United States Bankruptcy Judge

---

provisions of ERISA do not apply to top hat plans, to the extent that plaintiffs' claim for breach of fiduciary duty was based upon ERISA, the district court correctly dismissed it." (citation omitted)).

**Copies to:**

Brooke B. Chadeanyne, Attorney for Plaintiff
Betsy C. Cox, Attorney for Defendant